## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CELTIC BANK CORPORATION, a Utah Chartered Bank, | ) ) ) | No. 15 CV 30 |
| Plaintiff, | ) ) | |
| v. | ) ) | Magistrate Judge Young B. Kim |
| EXECUTIVE TITLE, INC., f/k/a Protect 1 Title, Inc., an Illinois corporation, MARTHA TOVIAS, and FERRANDO R. CARRANZA & ASSOCIATES, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | May 27, 2016 |

## MEMORANDUM OPINION and ORDER

In this diversity suit Plaintiff Celtic Bank Corporation ("Celtic Bank") alleges that Defendants Executive Title, Inc. ("Executive Title") and Fernando R. Carranza & Associates breached their obligations under a promissory note secured by a mortgage loan agreement and that Defendant Martha Tovias breached her unconditional guarantee of the promissory note. Claiming that Defendants defaulted on their obligations under the promissory note and unconditional guarantee, Celtic Bank seeks a judgment of foreclosure and an order of sale on the commercial property that is the subject of the mortgage. Before the court is Celtic Bank's motion for summary judgment. For the following reasons, the motion is granted:

## Procedural History

Celtic Bank filed its three-count complaint against Defendants in January 2015. (R. 1.) Count one is a claim for mortgage foreclosure, count two is a claim for foreclosure of liens and security interests, and count three is a claim against Tovias for breach of the commercial guarantee. Executive Title and Tovias included a counterclaim in their answer, alleging that Celtic Bank breached the promissory note by refusing to accept payments from Executive Title in October and November 2014. (R. 13, Ans. at 7-9.)

After the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 20), they informed the court that Executive Title had filed for bankruptcy, (R. 25). Celtic Bank sought and was granted leave to proceed with discovery with respect to its claim against Tovias during the pendency of Executive Title's bankruptcy proceedings despite the automatic stay. (R. 46.) After discovery closed Celtic Bank filed the current motion, seeking summary judgment on all three of its counts. (R. 52.) The court initially denied the motion without prejudice because the docket did not reflect that the stay had been lifted in Executive Title's bankruptcy proceedings. (R. 65.) Celtic Bank moved to reinstate the motion, notifying the court that the Executive Title bankruptcy proceeding was dismissed on January 5, 2016. (R. 66.) The court reinstated the current motion for summary judgment on April 29, 2016, and the motion is now ripe for resolution. (R. 68.)

# Local Rule 56.1

Before describing the factual background in this case, the court notes that Defendants' response to Celtic Bank's Local Rule 56.1 statement of facts and their statement of additional material facts, (R. 57), do not conform to Local Rule 56.1's requirements governing the submission of facts at the summary judgment stage. Local Rule 56.1 requires the moving party to submit a statement of material facts comprised of short, numbered paragraphs that are supported by citations to admissible evidence. L.R. 56.1(a); *Smith v. Lamz*, 321 F.3d 680, 682 (7th Cir. 2003). Celtic Bank did that here. Accordingly, Defendants as the non-moving parties were required "to respond particularly to each numbered paragraph and, in the case of disagreement, provide citations to supporting evidentiary material." *Smith*, 321 F.3d at 682; L.R. 56.1(b). Here, Defendants admitted 30 out of Celtic Bank's 42 factual assertions, and simply wrote "disagreed" or "denied in part" next to 10 of the 12 assertions they disputed without citing any evidence to support the disagreement. (R. 57, Defs.' Resp. to Pl.'s Facts.) They cited evidence to support only two of their responses to Celtic Bank's facts. (Id. ¶¶ 22, 27.) Similarly, Defendants failed to cite to any evidence in support of 15 out of the 39 factual assertions listed in their Local Rule 56.1 statement of additional facts, (id. at 5-13), despite the local rule's requirement that the non-moving party's statement of additional facts must include "references to the affidavits, parts of the record, and other supporting material relied upon," *see* L.R. 56.1(b)(3)(B). Celtic Bank argues that based on Defendants' non-compliance this court should deem admitted most of

the facts set forth in Celtic Bank's statement of facts, and argues that most of the facts set forth in Defendants' statement of additional facts should be stricken. (R. 60, Pl.'s Reply at 2-3.)

The Seventh Circuit has consistently held that trial courts are entitled to "strict compliance with Local Rule 56.1." *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005). Accordingly, where the non-moving party fails to dispute the moving party's statement of facts in the manner set forth in Local Rule 56.1, those facts are deemed admitted for purposes of the summary judgment motion. *Smith*, 321 F.3d at 683. Similarly, the court is within its discretion to ignore the additional facts submitted by the non-moving party if its submission does not conform to the rule by providing proper citations to the record. *Cichon*, 401 F.3d at 809-10; *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015). The purpose of imposing these fairly harsh consequences for non-compliance with the rule is to prevent trial courts from having to wade through the record or dig through insufficiently supported denials to determine whether a fact is genuinely in dispute. *Smith*, 321 F.3d at 683.

Here Defendants' "efforts cannot be considered compliant, let alone strictly compliant, with the requirements of Rule 56.1." *See Friend*, 789 F.3d at 711. With respect to their response to Celtic Bank's statement of facts, Defendants simply wrote "disagreed" next to the number that corresponds with six of their fact statements. (R. 57, Defs.' Resp. to Pl.'s Facts ¶¶ 31, 34-35, 37-38, 42.) That is plainly insufficient to render the facts in dispute under Local Rule 56.1. In

response to four other facts, Defendants provided a sentence stating why they disagree with Celtic Bank's statement but failed to support their response with any citation to evidence. (Id. ¶¶ 18, 20, 28, 29.) Those responses are similarly insufficient to raise a genuine fact dispute. *See Smith*, 321 F.3d at 683 (noting that "a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material"). Only Defendants' responses to paragraphs 22 and 27 cite record evidence, and accordingly, only those two paragraphs are genuinely in dispute. Celtic Bank's statement of facts is otherwise deemed admitted in its entirety.

Turning to Defendants' statement of additional facts, Celtic Bank argues that the court should strike 15 paragraphs from that statement because they are unsupported by references to the record. (R. 60, Pl.'s Reply at 3.) For the most part, the paragraphs in Defendants' statement of additional facts track and reference an affidavit submitted by Fernando Carranza, Defendants' attorney. Because of this close tracking, the court is able to see that paragraphs 10, 20, 22, and 29 of Defendants' additional facts are supported by paragraphs 8, 21, 23, and 30, respectively, of Carranza's affidavit. Because the court can identify the record support without resorting to the kind of "truffle-hunting" that Rule 56.1 is designed to prevent, *see Smith*, 321 F.3d at 683, the court will exercise its discretion to allow those paragraphs to stand. Moreover, paragraphs 38 and 39 simply describe the complaint and Defendants' answer, so they will be disregarded as unhelpful rather than as being unsupported. The remaining nine paragraphs lacking citation either

have no obvious support in Carranza's affidavit, rest on nothing more than an assertion that something is true "upon information or belief," or are improperly comprised of legal, rather than factual assertions. Accordingly, the court will not consider paragraphs 11-13, 15, 18-19, 21, 28, and 36 from Defendants' statement of additional facts in resolving the current motion for summary judgment.

## Facts

Having winnowed out the fact statements that fail to conform with Local Rule 56.1, the remaining facts are undisputed unless otherwise indicated.

## A. The Loan Documents

On May 18, 2007, Executive Title entered into a Promissory Note with First National Bank of Arizona in the amount of $450,000 and entered into a Mortgage and Security Agreement, a Security Agreement, and an Assignment of Rents and Leases to secure payment of the principal, interest, and other charges provided for in the Promissory Note. (R. 54, Pl.'s Facts ¶¶ 7-8.) The mortgage gave a security interest to First National Bank of Arizona in the real commercial property and improvements located at 5814 West Cermak, Cicero, Illinois 60804 ("the Property"). (Id. ¶ 9.) The Security Agreement and Assignment of Rents also gave it a security interest in certain collateral owned by Executive Title and in the rents, income, and profits generated from any leases on the Property. (Id. ¶¶ 10-11.) Also on May 18, 2007, Tovias signed an Unconditional Guarantee in which she guaranteed the payment of all of the amounts due and owing under the Promissory Note. (Id. ¶ 13.) After a second bank succeeded to First National Bank of Arizona's interest in the

Promissory Note, Mortgage, Security Agreement, Assignment of Rents, and Unconditional Guarantee (collectively, "the Loan Documents") and was put into receivership by the FDIC, Celtic Bank acquired the servicing rights for the Loan Documents on September 30, 2009. (Id. ¶¶ 14-16.) Celtic Bank is currently the legal holder of all of the rights, title, and interest in the Loan Documents. (Id. ¶ 16.)

## B. The Forbearance Agreements

When Celtic Bank acquired its interest in the Loan Documents Defendants' obligations under those documents were current, but Executive Title failed to make its monthly principal and interest installment payments from May through October 2011. (Id. ¶¶ 17-18.) Under the terms of the Promissory Note, a default occurs if Executive Title fails to make a payment when due or if it fails to pay real estate taxes on the Property when due. (Id. ¶¶ 24, 32.) A default occurs under the Mortgage if Executive Title fails to make a payment required by the Promissory Note or Mortgage, and a default occurs under the Security Agreement if Executive Title fails to make a payment when due under the Promissory Note or Security Agreement. (Id. ¶¶ 25-26.) Upon an event of default on the Promissory Note, the entire debt becomes immediately due and payable. (Id. ¶ 33.) In fact, the Promissory Note states that if there is a default, Celtic Bank may "[r]equire immediate payment of all amounts owing under this Note" and "[c]ollect all amounts owing from any Borrower or Guarantor" without notice or demand and without forfeiting any of its rights. (Id. Ex. 1A, Prom. Note § 5.) Celtic Bank also has the right upon default of the Promissory Note or Mortgage to collect all rents

accruing from leases on the Property and to evict tenants. (Id. ¶ 36.) Defendant Fernando R. Carranza & Associates, LTD is a tenant of the Property. (Id. ¶ 4.)

Because Executive Title failed to make its monthly payments, Executive Title and Celtic Bank entered into a written forbearance agreement ("the First Forbearance Agreement") on October 20, 2011, in which Celtic Bank agreed to forbear its rights and remedies under the Loan Documents until October 20, 2013, in exchange for Executive Title paying reduced monthly payments through the payment due in September 2013. (Id. ¶ 8; R. 54, Pl.'s Facts ¶ 19.) After the First Forbearance Agreement expired, Executive Title did not make its monthly payments due for the remainder of 2013. (R. 54, Pl.'s Facts ¶ 20.) On December 18, 2013, the parties entered into a second written forbearance agreement, under which Celtic Bank again agreed to forbear its rights and remedies under the Loan Documents in exchange for reduced monthly payments from Executive Title, this time through the period ending on October 1, 2014 ("the Second Forbearance Agreement"). (Id. ¶¶ 20-21 & Ex. G at 2.) The Second Forbearance Agreement states that Celtic Bank "shall have no obligation to forbear hereunder past October 01, 2014." (Id. Ex. G at 2.)

## C.  Request for a Third Forbearance Agreement

What happened after the Second Forbearance Agreement expired on October 1, 2014, is partly disputed. The parties agree that in early October 2014 Carranza, Executive Title's attorney, spoke with Skyler McClure, a Loan Portfolio Manager at Celtic Bank, by phone during which Carranza asked whether it would be possible to

enter into a third forbearance agreement. (R. 61, Pl.'s Resp. to Defs.' Add'l Facts ¶ 23.) No agreement was reached during this phone conversation as to future payments under the loan. (Id. ¶ 24.) On October 22, 2014, McClure emailed Carranza and wrote, "The previous forbearance agreement expired this month, I need to discuss renewing this with you as soon as possible. I have called your office and left multiple messages." (Id. ¶ 25; R. 58-1, Carranza Aff. Ex. 10.) Twenty-four hours later McClure emailed Carranza again and wrote, "This will be my last attempt to contact you regarding offering an additional forbearance agreement. The full payment is due and owing for October and the account is approaching 30 days past due." (R. 58-1, Carranza Aff. Ex. 11.) On October 31, 2014, Carranza emailed McClure documents McClure had requested in order to process the request for a third forbearance agreement. (R. 61, Pl.'s Resp. to Defs.' Add'l Facts ¶ 27.) On November 3, 2014, Celtic Bank processed Executive Title's request for a third forbearance agreement. (Id. ¶ 31.) Carranza and McClure spoke on the phone three days later and McClure told Carranza that his request was under consideration. (Id. ¶ 32.)

According to Defendants, but disputed by Celtic Bank, during this phone conversation McClure verbally agreed to allow Executive Title to make monthly payments of $2,888.73 to cover payments due in October and November 2014 and for the monthly payments going forward. (R. 57, Defs.' Add'l Facts ¶ 32.) It is undisputed, however, that Celtic Bank ultimately declined Defendants' request for a third written forbearance agreement. (R. 61, Pl.'s Resp. to Defs.' Add'l Facts ¶ 34.)

On November 7, 2014, Executive Title sent Celtic Bank a check in the amount of $2,888.73. (Id. ¶ 35.) Celtic Bank did not accept the check. Instead, on November 14, 2014, Celtic Bank sent Executive Title a notice of default and intent to accelerate the loan based on Executive Title's failure to pay the October and November 2014 monthly payments and late fees. (Id. ¶ 37.) Executive Title and Tovias failed to pay the outstanding balance due under the Promissory Note, including accrued late fees, in response to the notice of default. (R. 54, Pl.'s Facts ¶ 31.)

Also according to Defendants, but disputed by Celtic Bank, on November 3, 2014, Carranza and McClure exchanged emails regarding the payment of real estate taxes, and "reached an agreement" that the outstanding taxes would be paid "within the next subsequent months." (R. 57, Defs.' Add'l Facts ¶ 29.) It is undisputed that Defendants did not pay the real estate taxes until after this lawsuit was filed. Specifically, on July 14, 2015, Executive Title paid the 2013 real estate taxes that were due back in March and August 2014. It then paid the 2014 real estate taxes that were due in March and August 2015 on October 28, 2015, the day after it was ordered by the bankruptcy court to make the taxes current. (Id. ¶ 30; R. 61, Pl.'s Resp. to Defs.' Add'l Facts Exs. A, C & E.)

## Analysis

Celtic Bank argues that summary judgment is appropriate with respect to all of its claims because, according to it, the undisputed facts demonstrate that Defendants defaulted on the loan documents by failing to make timely payments in

October and November 2014, and by failing to timely pay the 2013 and 2014 real estate taxes. (R. 53, Pl.'s Mem. at 7.) In response, Defendants argue that the parties engaged in a course of conduct that modified the loan agreement. Specifically, they argue that in November 2014 McClure verbally agreed on behalf of Celtic Bank to accept monthly payments of $2,888.73 to cover the October and November 2014 payments and all subsequent monthly payments. (R. 58, Defs.' Resp. ¶ 34.) They also argue that any default based on failure to timely pay real estate taxes was cured by an agreement reached by Carranza and McClure by email on November 3, 2014, in which Celtic Bank agreed to allow Executive Title to pay the outstanding taxes "within the next subsequent months." (Id. ¶ 32.) According to Defendants, Celtic Bank breached the "modified" loan agreement by refusing to accept Executive Title's November 2014 payment of $2,888.73. Tovias joined Defendants' response to the motion for summary judgment and has not raised any arguments denying her liability under the commercial guarantee that are separate or distinct from Defendants' arguments regarding their underlying liability.

In a diversity case this court applies federal procedural law and state substantive law. *Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999). Summary judgment is appropriate where the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment this court must view the evidence in the light most favorable to the non-moving parties, drawing all reasonable inferences in their favor. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. In evaluating a motion for summary judgment the court will limit its analysis of the facts "to evidence that is properly identified and supported in the parties'" Local Rule 56.1 statements. *See Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

As an initial matter, Defendants argue that Celtic Bank's summary judgment motion should be denied because it was not filed within 30 days of the close of discovery under Rule 56(b). Rule 56(b) states that the 30-day rule applies unless "the court orders otherwise." Fed. R. Civ. P. 56(b). Here the court ordered Celtic Bank to file its motion by February 29, 2016, and Celtic Bank filed the motion on that day. (R. 51; R. 52.) Defendants' procedural argument is frivolous.

Turning to the substance of this dispute, Celtic Bank's motion rests on its assertion that Defendants breached their obligations under the Loan documents by failing to make the required monthly payments in October and November 2014 and by failing to timely pay the 2013 and 2014 real estate taxes. The parties do not dispute that under the terms of the Loan Documents Illinois law governs the substance of this foreclosure action. *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies." (citation omitted)). Under Illinois law "a mortgagee may foreclose its interest in real property upon either the debt's maturity or a default of a condition in the

instrument." *See PNC Bank, Nat'l Ass'n v. Zubel*, 24 N.E.3d 869, 874 (Ill. App. Ct. 2014) (internal quotation and citation omitted). Defendants admit that they were in default under the Loan Documents for failure to make monthly payments on several occasions. (R. 57, Defs.' Resp. to Pl.'s Facts ¶¶ 5-6, 14.) But they characterize these defaults as "technical defaults," and argue that any default was cured first by the two forbearance agreements and then by a course of conduct culminating in an oral agreement reached between Carranza and McClure. (R. 58, Defs.' Resp. at 5-9.)

To the extent Defendants argue that their default was cured by the First and Second Forbearance Agreements, that argument is belied by the plain language of those documents. The First Forbearance Agreement states that Celtic Bank "agrees to forbear from pursuing remedies with respect to the Default . . . until or after October 20, 2013." (R. 54, Pl.'s Facts Ex. F at 2.) It further states that the First Forbearance Agreement does not waive Executive Title's "obligation to cure the Default and perform all of [its] obligations under the Loan Documents" and that accordingly, except as Celtic Bank "has agreed to forbear there from by this Agreement," it "shall have the discretion to enforce fully any and all of its rights under the Loan Documents at any time." (Id. at 3.) It further states that the First Forbearance Agreement "is not intended to effect any modification or amendment to any of the Loan Documents but instead merely sets forth the terms and conditions pursuant to which [Celtic Bank] will forbear from enforcing its rights there under." (Id. at 4.) Accordingly, the undisputed evidence shows that the First Forbearance Agreement did not cure past defaults or waive Celtic Bank's right to pursue

remedies for past defaults, but rather simply outlined the terms by which it agreed to temporarily forbear those rights.

The Second Forbearance Agreement includes similar language precluding Defendants' argument that their past defaults were cured. It states that the parties agreed that the loan was 78 days past due on payments as of December 18, 2013, because Executive Title had missed its payments from October through December 2013. (Id. Ex. G at 1.) It further states that Celtic Bank agreed to forbear from pursuing its claims only until October 1, 2014, and that it did so "[w]ithout waiving, or being estopped from later asserting, or otherwise in any manner prejudicing, any and all claims Lender may have against Borrower or Guarantor." (Id. at 2.) Again, on its face the Second Forbearance Agreement states that Celtic Bank was only temporarily forbearing its rights, and nothing in the document states that it would be precluded from later pursuing its rights based on Defendants' past defaults.

Nor could any reasonable jury conclude, as Defendants argue, that the fact that Celtic Bank was twice willing to enter into written forbearance agreements of limited durations establishes a course of conduct by which they modified the payment schedule under the Loan Documents and were bound to negotiate and enter into a third forbearance agreement. Under Illinois law, a contract modification is one "which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *Int'l Bus. Lists, Inc. v. AT&T Co.*, 147 F.3d 636, 641 (7th Cir. 1998). Whether there was an oral modification, including through a course of conduct, is a question of fact.

*Household Fin. Servs., Inc. v. Costal Mortg. Servs., Inc.*, 152 F. Supp. 2d 1015, 1022 (N.D. Ill. 2001).  A modification is only valid if it satisfies the criteria for forming a valid contract, including offer, acceptance, and consideration.  *Int'l Bus. Lists*, 147 F.3d at 641.  Because mutual assent is essential to contract modification, one party cannot modify a contract without the knowledge and consent of the other.  *See Leavitt v. John Hancock Life Ins. Co.*, No. 04 CV 7451, 2007 WL 625636, at *8 (N.D. Ill. Feb. 23, 2007).  But one party can show a valid contract modification where the "party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance."  *Int'l Bus. Lists*, 147 F.3d at 641.

Defendants argue that what they call the "technical default" stemming from their late installment payments was cured by a course of conduct culminating in an oral agreement entered into by McClure and Carranza on November 6, 2014.  According to Defendants, those negotiations began on October 1, 2014, the day after the Second Forbearance Agreement expired, when Carranza asked McClure in a telephone conversation for an extension of Celtic Bank's forbearance in exchange for payments of $2,888.73 per month.  Defendants assert that after forwarding Celtic Bank documents to support its request, on November 6, 2014, McClure verbally agreed with Carranza that Celtic Bank would accept payments of $2,888.73 for the payments due in October and November 2014, and that those payments would cure the default.  Defendants forwarded a $2,888.73 check to Celtic Bank the next day, but on November 14, 2014, Celtic Bank sent Executive Title a notice of default

based on Executive Title's failure to make payments on October 1 and November 1, 2014. (R. 54, Pl.'s Facts Ex. H at 1.) According to Defendants, Carranza's and McClure's oral agreement modified Executive Title's obligations under the Promissory Note, cured any default, and obligated Celtic Bank to accept the $2,888.73 payment Carranza tendered.

To the extent Defendants rely on a "course of conduct" to argue that Celtic Bank agreed to modify the loan repayment schedule, the undisputed facts show that a key ingredient to the course of conduct defense is missing: Celtic Bank's acquiescence. As explained above, a contract is only validly modified through a course of conduct where the "party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance." *Int'l Bus. Lists*, 147 F.3d at 641. Here, the undisputed evidence shows that Celtic Bank rejected the reduced payment Defendants submitted in November 2014. It also formally rejected Defendants' request for a third forbearance agreement in November 2014. Defendants have pointed to no facts that would support a finding that Celtic Bank engaged in a course of conduct consistent with acceptance of reduced payments after October 2014. *See Leavitt*, 2007 WL 625636, at *8. Accordingly, to the extent Defendants rely on Celtic Bank's post-October 2014 course of conduct, no reasonable jury could conclude that through its conduct Celtic Bank acquiesced in a modification of the payment schedule set forth in the Loan Documents.

That leaves Defendants' argument that the payment schedule was modified by an oral agreement reached between McClure and Carranza on November 3, 2014. The only response Celtic Bank raises to this argument is its assertion that even accepting as true that Carranza and McClure entered into an oral agreement, such an oral modification is prohibited by the terms of the Promissory Note, which states that Executive Title may not use an oral statement from Celtic Bank to alter the written terms of the Promissory Note.[1]  (R. 60, Pl.'s Reply at 6.)  But under Illinois law a written contract may be modified by a subsequent oral agreement even when the contract precludes oral modifications." *Household Fin. Servs.*, 152 F. Supp. 2d at 1022.  Moreover, whether an oral modification exists and the extent of the modification are questions of fact for the trier of fact."  *Id.* at 1023; *see also Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 852 (7th Cir. 2005).  Here the parties' fact statements reveal dueling affidavits, with McClure averring that he never reached an agreement with Carranza regarding modified payments and with

---

[1] Celtic Bank has not argued that the Loan Documents are subject to the Illinois Credit Agreement Act, 815 ILCS 160/1, *et seq.*, which bars a debtor from asserting "that a new credit agreement is created, based on the agreement by a creditor to modify or amend an existing credit agreement," unless that credit agreement is in writing and signed by both the creditor and the debtor. *Comerica Bank v. Nali, Inc.*, No. 14 CV 4884, 2015 WL 5920787, at *4 (N.D. Ill. Oct. 8, 2015); *MB Fin. Bank, N.A. v. Patel*, No. 10 CV 6566, 2012 WL 346456, at *3 (N.D. Ill Feb. 1, 2012); *In re: Plenipotentiary Ltd. v. Am. Nat'l Bank & Tr. Co. of Chi.*, Nos. 92 B 12342, 92 C 2717 & 93 A 00259, 1993 WL 135970, at *8-*9 (N.D. Ill. Br. Apr. 15, 1993).  "Courts have routinely held . . . that counterclaims or affirmative defenses relying on oral (or non-memorialized) agreements to modify existing credit agreements are barred by the ICAA." *FirstMerit Bank, N.A. v. Emerald Props., LLC*, No. 13 CV 5961, 2014 WL 1292865, at *3 (N.D. Ill. Mar. 28, 2014).  Nor has it argued that McClure lacked the authority to bind Celtic Bank via an oral argument to modify the Loan Documents, despite McClure's affidavit asserting that he lacks such authority.  (R. 63-1, McClure Aff. ¶ 8.)

Carranza averring that he did.  Typically, that fact dispute would be one that a trier of fact would have to resolve.  But here, even accepting as true Carranza's version of events, Defendants have not shown that they complied with what they describe as the agreement to modify the payment schedule.  The only evidence Defendants put forth in support of the oral modification is Carranza's affidavit, in which he states that on November 6, 2014, he informed McClure that Executive Title "was prepared to make the fully amortizable payments of $2,888.73 from this point forward—so to cover the October and November 2014 payments, and all subsequent payments." (R. 58-1, Carranza Aff. ¶ 32.)  Carranza states that McClure verbally accepted this offer.  (Id.)  He further states that on November 7, 2014, he sent one check for $2,888.73 to cover the October 2014 payment.  (Id. ¶¶ 33-34.)  But there is no evidence that he ever sent a check for the November 2014 payment, as Executive Title was required to do under Carranza's own description of the oral agreement. Nor is there any evidence that Executive Title made any payment with respect to overdue late fees.[2]  The Loan Documents allow Celtic Bank to issue a Notice of Default after a single default event, so even assuming that Defendants cured their default of the October 2014 payment under the terms of what they say is an oral agreement, they have submitted no evidence that they paid the November 2014 payment in accordance with that agreement, and by the time Celtic Bank issued the Notice of Default on November 14, 2014, the November 2014 payment was past due.

---

[2]  Although Carranza's affidavit states that McClure waived the late fees on January 21, 2014, (R. 58-1, Carranza Aff. ¶ 16), there is no evidence that he waived late fees that accrued between that date and the date Celtic Bank issued the Notice of Default.

There is no evidence that Defendants attempted to cure their default by paying the November 2014 payment and late fees within the 10-day cure period set forth in the Notice of Default. Thus even under Defendants' version of events, Celtic Bank has shown that Defendants defaulted on their payment obligations.

Celtic Bank has also shown that it is entitled to summary judgment with respect to the second relevant default event: Defendants' failure to timely pay the 2013 and 2014 real estate taxes. Defendants do not dispute that the Loan Documents require them to pay real estate taxes on the Property in a timely manner, and that their failure to do so constitutes a default of their obligations. Nor do Defendants dispute that they failed to pay the 2013 and 2014 real estate taxes until after they were due and after this suit was filed. They argue, however, that Carranza and McClure reached an agreement via email on November 3, 2014, which "cured any default under the Promissory Note related to payment of the real estate taxes" by allowing them to pay the outstanding taxes "within the next subsequent months." (R. 58, Defs.' Resp. at 7.) As an initial matter, the court notes that the only evidence Defendants present in support of this "agreement" is Carranza's affidavit, where he merely asserts that he reached the agreement by email with McClure. (Id. Carranza Aff. ¶ 30.) But Defendants did not attach the email Carranza references as an exhibit to his affidavit or anywhere else in the record. As the Seventh Circuit has made clear, summary judgment is the "put up or shut up" moment in a lawsuit, meaning that the non-moving party "is required to marshal and present the court with the evidence she contends will prove her case."

*See Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). In the context of loan modifications, conclusory allegations in an affidavit that are unsupported by corroborating documentation are insufficient to meet the Rule 56 standard requiring concrete facts establishing a genuine fact dispute. *See Fast Tek Grp., LLC v. Plastech Engineered Prods., Inc.*, No. 1:05-CV-01868-DFH-TA, 2006 WL 2228960, at *6-*7 (S.D. Ind. Aug. 3, 2006); *see also United Cent. Bank v. Maple Court, LLC*, No. 10-CV-00464, 2013 WL 4517243, at *4 (E.D. Wis. 2013) (rejecting defendants' argument that late tax payments were subject to an escrow agreement where "they do not offer any proof of such an agreement"). In addition, the advisory committee notes to Rule 56(c) make clear that "materials referred to in an affidavit or declaration—must be placed in the record." Fed. R. Civ. P. 56(c) advisory committee notes 2010. If there is an email evidencing an agreement to forgive Defendants' default with respect to the tax payments, this was the time for Defendants to present that email.[3]

Even if the court were to overlook the missing evidence, Defendants do not dispute that they failed to pay any real estate taxes in the two month interim between that agreement and the filing of this lawsuit. And importantly, the only

---

[3] Prior to the 2010 amendments to the Federal Rules of Civil Procedure, Rule 56(e)(1) explicitly required that a sworn or certified copy of any paper referenced in an affidavit be attached to the affidavit. The advisory committee's 2010 notes state that this requirement was omitted from the amendments "as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record." *See* Fed. R. Civ. P. 56(c) advisory committee notes 2010. That note has been interpreted to mean that "the requirement to support statements in affidavits with admissible evidence on the record remains." *See Fratz v. Goldman & Warshaw, P.C.*, No. 11-cv-02577, 2012 WL 4931469, at *7 n.8 (E.D. Pa. Oct. 16, 2012).

evidence supporting Defendants' argument with respect to taxes is Carranza's statement that the agreement was for Executive Title to pay the overdue taxes "as soon as possible." (R. 58-1, Carranza Aff. ¶ 30.) Even taking Carranza's testimony and the existence of the agreement at face value, Executive Title failed to pay the 2013 real estate taxes until after this lawsuit was filed and more than eight months after the agreement to which Defendants now point as the "cure" to their admitted default. It is also undisputed that Executive Title did not pay the 2014 real estate taxes until October 28, 2015, the day after it was ordered to do so by the bankruptcy court. (R. 61, Pl.'s Resp. to Defs.' Add'l Facts ¶ 30.) Given that Executive Title was able to bring the property taxes current within a day of the court's order, even assuming Carranza and McClure entered into an agreement, no reasonable jury could conclude that Executive Title paid the taxes "as soon as possible." Based on the limited evidence Defendants have submitted in support of their argument that their default with respect to the payment of property taxes was cured, no reasonable jury could find that the parties entered into an agreement to forgive Defendants' late payment of the real estate taxes or that they complied with that supposed agreement. Thus even taking the facts in the light most favorable to Defendants, there is no genuine dispute of material fact regarding Defendants' default of the Loan Documents. Accordingly, Celtic Bank is entitled to summary judgment with respect to all three of its claims.

Turning to the question of damages, typically in the face of disputed facts the calculation of damages would be a question for a fact-finder. *See Hillman v. City of*

*Chicago*, 66 F. Supp. 3d 1109, 1115 (N.D. Ill. 2014). But here, all of the facts that Celtic Bank submitted regarding its damages have been deemed admitted. (See R. 54, Pl.'s Facts ¶¶ 37-42.) Because Defendants failed to submit any facts to refute Celtic Bank's fact statements on this issue, Celtic Bank is entitled to damages in the amount of $553,633.97 that was due and owing under the Promissory Note as of February 29, 2016, the day Celtic Bank filed its motion for summary judgment, plus interest that has accrued since then at the rate of $56.29 per diem. (Id. ¶ 42); *see FirstMerit Bank, N.A. v. Grear*, No. 13 CV 3627, 2013 WL 5835641, at *3 (N.D. Ill. Oct. 28, 2013) (deeming admitted evidence as to amount of damages where defendant failed to marshal evidence contradicting plaintiff's damages calculation).

## Conclusion

For the foregoing reasons, Celtic Bank's motion for summary judgment is granted.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**